

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7982 | **DATE** | 7/23/2002 |
| **CASE TITLE** | Susan Smith vs. Alcon Laboratories, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: For the foregoing reasons, the motion for summary judgment brought by defendant Alcon Laboratories, Inc. pursuant to FRCP 56 is granted. Judgment is entered in favor of Alcon on all counts. This is a final and appealable order. This case is terminated.**

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| ✓ | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

JUL 2 4 2002
date docketed

CDY
docketing deputy initials

date mailed notice

Document Number

45

TSA
courtroom deputy's initials

date/time received in central Clerk's Office

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SUSAN SMITH,                        )
                                    )
      Plaintiff,              )
                                    )   No. 00 C 7982
   v.                           )
                                    )   Wayne R. Andersen
ALCON LABORATORIES, INC.,           )   District Judge
                                    )
      Defendant.              )

**DOCKETED**

JUL 2 4 2002

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the motion for summary judgment filed by the defendant Alcon Laboratories, Inc (hereinafter referred to as "Alcon") pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the defendant's motion for summary judgment is granted.

## BACKGROUND

The following factual background is taken from the parties' statements of material facts filed pursuant to Local Rule 56.1. Plaintiff, Susan Smith, is an African-American female who was hired by Alcon on November 30, 1998 as a medical sales representative. Defendant Alcon manufactures and sells prescription drugs and eye-care products. Smith's job as a medical sales representative at Alcon was to promote the following four drugs: Ciloxan, Patanol, TobraDex, and Cipro HC.

Throughout her tenure at Alcon, Dave Pygon served as Smith's immediate supervisor. Pygon was Alcon's district sales manager who, in turn, reported to Tom Dooley, Alcon's regional director of sales. Based on the record in this case, Smith's problems at Alcon began in

December of 1998. While Pygon and Smith were attending a training meeting during that month, Smith alleges that Pygon pointed to an African-American man who was in attendance and told Smith that he was "the whitest black guy" he had ever seen. (Pltf. 56.1 Stmt at ¶ 18; Cmplt. ¶ 9(c).) The record contains no indication that Smith complained to Pygon about this comment. The next month, Smith and Pygon were eating at a Big Apple Bagels restaurant. During the course of a conversation while eating lunch, Smith alleges that Pygon told her that "he had a [basketball] teammate that did not like black people and did not trust them, because a black man had broken into that man's house and terrorized his family." (Pltf. 56.1 Stmt. at ¶ 20). Pygon then said, "And I understand where he's coming from, don't you?" (Cmplt. ¶ 9(b).) To which Smith replied, "No. I don't." (*Id.*) Smith then alleges that Pygon indicated that such an attitude "makes sense . . . if that's the only experience you have had with black people." (Pltf. 56.1 Stmt. at ¶ 20; Cmplt. ¶ 9(b).) Later, in the same conversation, Smith admits to telling Pygon that her grandfather would not allow a white person to enter his house. (Pltf. 56.1 Stmt. at ¶ 21.) Based on our reading of the record, these two incidents are the only ones in which Smith alleges that her supervisor Pygon was directly involved in making questionable comments.

Aside from challenging certain remarks made by her direct supervisor, Smith also objects to numerous statements made by her co-workers which she contends were racially insensitive. Specifically, Smith has referenced comments made by Danielle Koll in either January or February 1999. Smith stated in her deposition that the challenged comments arose during the following conversation: "I [Smith] said, 'I have my clothes altered, small waist, big butt,' and she [Koll] made a comment, like, 'Ew, I would take the small waist.'" (Smith Dep. at 100, 103.) Smith further alleges that Koll made a comment about the size of Smith's lips, but she does not

2

remember what the specific comment was, other than to generally recollect that the remark was unfavorable. (Pltf. 56.1 Stmt. at ¶ 24.) Smith admitted in her deposition that she never complained to anyone about Koll's alleged statements. (Smith Dep. at 106.)

Smith also claims that another co-worker, Julie Nelson, made racially insensitive comments to her in January and February 1999. Smith alleges that she showed Nelson a picture of her boyfriend, who is Caucasian, and Nelson remarked that she "would never go out with a black man." (Smith Dep. at 44-45.) Smith further alleges that, during a national sales meeting in Florida, the table conversation turned to the issue of affirmative action. As the dialogue progressed, Nelson allegedly claimed that "affirmative action was, essentially, a free ride through the system." (Smith Dep. at 52.) During the dinner, Smith asked Pygon, who also was at the table during the conversation, whether he had heard what Nelson had said about affirmative action. Pygon answered that he had not heard her comment and then he allegedly said: "Susan, you'll learn that there are two things you don't enter into. You don't enter into politics, and you don't discuss religion, because you may uncover something that you didn't want to uncover and that you didn't want to know." (Smith Dep. at 53.)

Shortly after the conversation about affirmative action, Smith confronted Pygon about Nelson's comments on the phone. Smith had admitted in her deposition that she was "very hesitant" to tell Pygon that she thought there were "straight-out race problems" between herself and Pygon. (Smith Dep. at 65.) Accordingly, she did not complain directly to Pygon about the comments he earlier made a few months earlier at the training meeting or at the Big Apple Bagels restaurant. Nevertheless, she did complain to Pygon about Nelson's comments that she would never date a black man, and she expressed disappointment that she was being "subjected

3

to things that [she] really didn't think went on at a professional company." (Pltf. 56.1 Stmt at ¶ 111; Smith Dep. at 96-97.) At that time, Smith did not ask Pygon to do anything to remedy the issues she had with Nelson because she believed that if she "relayed incidents with racial undertones that he would take it upon himself, according to Alcon's policies, that he would take it upon himself to take care of it." (Smith Dep. at 67.)

According to Smith, however, Pygon did not follow up on her allegations but instead criticized her interpersonal skills on his field visitation report for Smith which was completed after the national sales meeting. Smith further alleges that her co-workers became rude and indifferent toward her following her complaints about Nelson's "culturally insensitive" statements, though Smith is unable to provide specifics about this alleged rudeness and indifference. (Pltf. 56.1 Stmt. at ¶¶ 31-39.)

Smith also asserts that she had a conversation with Tom Dooley, Pygon's immediate supervisor, during a field visit in April 1999, in which she told Dooley that she did not think Pygon liked her. (Smith Dep. at 108.) However, Smith conceded in her deposition testimony that she did not tell Dooley why she believed Pygon did not like her. In fact, she stated "I didn't give him specific reasons. I certainly didn't say I'm black and that's what I feel about Dave." (Smith Dep. at 110.)

According to Smith, she again confronted Pygon in August 1999 regarding his alleged failure to address her complaints about racial discrimination at Alcon which stemmed from Nelson's culturally insensitive statements. Pygon wrote a summary of the comments Smith made to him during the August 1999 field visit in his field visitation report. This summary states that Smith complained of "rude statements" made to her at the national sales meeting. Smith

4

responded to Pygon's summary by briefly stating that it was incomplete and that it failed to note that he had been informed earlier about the allegedly racist comments and that he had done nothing to resolve the situation. (Pltf. 56.1 Stmt. at ¶ 130.) In response to Smith's criticism of his written summary, Pygon asked her to clarify her complaints by putting them in writing. (Plft. 56.1 Stmt. at ¶ 55.) Smith refused to document her complaints in the field visitation evaluation. (*Id.*) After this August meeting, Smith alleges that Pygon stopped speaking to Smith on a non-professional level and he continued to criticize her interpersonal skills on subsequent field evaluations. (Pltf. 56.1 Stmt. at ¶ 143-44.)

Smith also alleges that she complained about the purported racial harassment by sending an e-mail to Pygon after his field visit in August 1999. In that e-mail, Smith reminded Pygon that she had informed him about the two comments Nelson made during the national sales meeting in February. In response to the complaints made to him during Smith's field visit and in her email, Pygon left a voicemail to the district warning all sales representatives to be mindful of what they said so as to avoid offending their colleagues. (Pltf. 56.1 Stmt. at ¶ 61; Smith Dep. at 129.)

That concludes the factual background surrounding Smith's allegations of racial discrimination. However, the story does not end there. On September 27, 1999, Smith injured her Achilles tendon training for the 2000 Olympics. She had surgery to repair the injury on October 5, on which date Alcon placed her on short-term disability leave. According to Alcon's short-term disability policy, a temporarily disabled employee's job will be held open for up to twenty-five (25) weeks. While the exact position the employee held prior to taking disability status may not be available at the time she is ready to return to work, Alcon pledged to offer the

same or equivalent job for which the employee was qualified, provided that such a job was open when the employee returned to work. Based on the Court's independent calculation of the twenty-five week disability period, Smith's short-term disability benefits terminated on April 4, 2000. Under Alcon's written policy, at the conclusion of a short-term disability period, an employee could request to be placed on long-term disability for an additional twelve (12) months.

As conceded by the plaintiff, Smith did not inform Alcon that she would be able to return to work prior to the expiration of her short-term disability benefits and she did not request to be placed on long-term disability status. Therefore, on April 6, 2000, Dooley and Jay Jones, a manager of the Alcon Human Resources Department, called Smith to inform her that Alcon was going to exercise its right to replace her in her territory. (Dooley Dep at 51; Pygon Dep. at 66.) Alcon also informed Smith that it did not have another position for her should she be able to return to work. (Def. 56.1 Stmt. at ¶ 91.) Shortly thereafter, an Alcon representative came to Smith's residence to retrieve her company car, her laptop computer, and her drug samples.

Although Jones and Dooley did not tell Smith on April 6 that she was discharged from Alcon, Smith believed she had been fired. However, according to Alcon, Smith was not discharged but, rather, her status was changed from short-term disability to unpaid medical leave. In support of this assertion, Alcon notes that Smith was sent work-related correspondence after April 6 and that she was sent a new edition of the Alcon employee handbook in late April. In addition, Jones sent Smith a letter, dated May 11, 2000, responding to a request Smith had made for accrued vacation time. In that letter, Jones stated that "[y]our current status is an unpaid medical leave of absence." Furthermore, Jones also requested that Smith send Alcon medical

6

documentation to facilitate a decision to either release her or place her on long-term disability. The letter gave Smith until May 23, 2000 to either submit the requested medical information or face dismissal. (Def. 56.1 Stmt. at ¶ 92-96.) Because Smith did not provide any information concerning her medical condition by the stated date, Alcon discharged her on May 31, 2000.

On April 12, 2000, Smith filed a charge with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination and retaliation. The EEOC issued Smith a Notice of Right to Sue on September 28, 2000. In accordance with that notice, the plaintiff filed the instant two-count lawsuit on December 20, 2000 alleging race discrimination/hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964.

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions of file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The non-moving party must then set forth specific facts showing there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548 (1986).

In making this determination, the Court must draw every reasonable inference from the record in the light most favorable to the non-moving party and should not make credibility determinations or weigh evidence. *Association Milk Producers, Inc. v. Meadow Gold Dairies, Inc.*, 27 F.3d 268, 270 (7th Cir. 1994). The non-moving party must support its contentions with admissible evidence and may not rest upon mere allegations in the pleadings or conclusory statements in affidavits. *Celotex*, 477 U.S. at 324. The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to its case and on which that party will bear the burden of proof at trial. The production of only a scintilla of evidence will not suffice to oppose a motion for summary judgment. *Anderson*, 477 U.S. at 252. Employment discrimination cases, while often turning on factual questions, are nonetheless amendable to summary judgment when there is no genuine dispute of material fact or there is insufficient evidence to demonstrate the presence of the alleged motive to discriminate. *Cliff v. Board of School Comm'r*, 42 F.3d 403, 409 (7th Cir. 1994).

## I.    Title VII Race Discrimination/Hostile Work Environment

Title VII of the Civil Rights Act of 1964 provides that it "shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, there are a variety of different causes of action that can be brought by an employee against her employer, including claims of harassment, disparate treatment, discrimination, and being subjected to a hostile work environment. In this case, Smith

has not made it clear in either her complaint or in her brief in response to Alcon's motion for summary judgment which Title VII claim she is raising (other than retaliation which is designated as Count II). Therefore, we will analyze the facts of this case with respect to both race discrimination and hostile work environment under Title VII as those are the claims that are most readily identifiable based on the arguments raised in her pleadings.

### A.      Race Discrimination

A plaintiff may establish a case of race discrimination using either direct or indirect evidence. If, as here, Smith makes no claim to possessing direct evidence of Alcon's discriminatory intent against her, then she may proceed indirectly through the burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 92 S.Ct. 1817 (1973). The legal principles associated with this indirect method are well-settled. As the Seventh Circuit recently confirmed:

> First, plaintiff must make out a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Where a plaintiff alleges discriminatory treatment, he must demonstrate that (1) he belongs to a protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) his employer treated similarly-situated employees outside of his protected class more favorably. *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997); *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1132 (7th Cir. 1994). Once a plaintiff has made this showing, there is a presumption that he was discriminated against, and the employer must come forward with a legitimate, non-discriminatory reason for the employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Lenoir*, 13 F.3d at 1133. At this stage, the employer need not prove that it was actually motivated by the proffered reason. Rather, an employer "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 257, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the defendant meets this burden of production, the plaintiff must prove by a preponderance of the evidence that the reason offered by the defendant is merely pretext for discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *Plair*, 105 F.3d at 348.

*Stockett v. Muncie Indiana Transit Sys.*, 221 F.3d 997, 1001-01 (7th Cir. 2000). *See also Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885-86 (7th Cir. 2001). In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 2106 (2000), the Supreme Court confirmed that, under the *McDonnell Douglas* framework, "the ultimate burden of persuading the trial of fact that the defendant intentionally discriminated against the plaintiff *remains at all times with the plaintiff.*" (Emphasis added.)

After reviewing all of the plaintiff's evidence and making every reasonable inference in her favor, we find that Smith has made a *prima facie* case of employment discrimination on the basis of race. There is no dispute that Smith is a member of a protected class (i.e. African-American). As for the second requirement that the plaintiff must have been performing her job in a satisfactory manner, the evidence in the record suggests that Smith's sales performance during her tenure at Alcon was satisfactory. According to Smith's Rule 56.1 Statement, Smith received an overall "good solid performance" rating on her six-month evaluation from Pygon based on her "solid selling skills" and marked improvement in her ability to sell two of Alcon's major drug products. This above average rating was awarded with a 5% salary increase. (Pltf. 56.1 Stmt. at 117-19.) While there were no subsequent official evaluations between June 1999 and her surgery in October of that year, we will assume for purposes of this motion that Smith continued to perform at a satisfactory level until she took short-term disability status.

The third *prima facie* element for a race discrimination claim is that the plaintiff must have suffered an adverse employment action. There is no dispute on this point. Alcon dismissed Smith from her position as a medical sales representative effective May 31, 2000. Finally, the

fourth *prima facie* element requires Smith to show that a similarly-situated employee, not in her protected class, was treated more favorably than her. While this factor was not discussed in any detail in her briefs, Smith's Rule 56.1 Statement of Material Facts does include at least one instance when a white employee was allegedly treated more favorably than her. Smith asserts that, while she was on short-term disability, Pygon did not offer to assist her by working her sales territory for her. Smith alleges that Pygon assisted a fellow sales representative, who was white, when she was on medical leave in May 1999. (Pltf. 56.1 Stmt. at ¶ 154.) Pygon's assistance to this individual consisted of dropping off samples to customers when she was physically incapable of doing so. (*Id.*) Therefore, we conclude that Smith has made the minimal showing necessary to make out a *prima facie* case of race discrimination.

However, a finding that a plaintiff has made her *prima facie* case does not end the inquiry. At this point, under the *McDonnell Douglas* regime, the burden shifts to the employer to provide a legitimate, non-discriminatory rationale for the dismissal. According to Alcon, Smith was replaced in her territory on April 6, 2000 because she had not returned to work within the twenty-five week short-term disability period. While Smith may disagree with the mechanical process of counting the twenty-five weeks, this Court agrees with Alcon that the short-term disability period ended on April 4, 2000 (which is exactly twenty-five weeks from the start of her short-term disability period on October 12, 1999). Because Smith made no request to be placed on long-term disability, Alcon was operating within its prerogative to replace Smith in her territory. Alcon did in fact replace Smith within her sales territory on April 6, 2000, and it eventually discharged her on May 31, 2000 because she did failed to respond to Alcon's request for necessary medical documentation connected with her unpaid medical leave status. Based on

our reading of the record, we can find no evidence that these employment decisions concerning Smith were motivated by "discriminatory animus." *Burdine*, 450 U.S. at 257.

Since Alcon has provided a non-discriminatory reason for Smith's discharge, plaintiff must next advance some evidence that Alcon's explanation was motivated by pretext. Pretext under the *McDonnell Douglas* burden-shifting method of proof does not mean a mistake, but "a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). Smith must show that Alcon's reason for discharging her was unworthy of credence. *See Reeves*, 530 U.S. at 143. That is, Smith must produce "'evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge.'" *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888-89 (7th Cir. 2001) (quoting *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 395 (7th Cir. 1998)).

In this case, Smith has failed to meet her burden to produce evidence demonstrating pretext. In her brief in opposition to the motion for summary judgment, Smith identifies three potential pieces of evidence to support her argument that Alcon's proffered reasons supporting her discharge were pretextual. Specifically, Smith argues there is evidence in the record suggesting that Alcon actually discharged Smith on April 6, 2000 as opposed to May 31, 2000. Additionally, Smith argues that the May 11, 2000 letter from Alcon requesting medical documentation to change her status from "unpaid medical leave" to active duty status was "suspicious" because it was sent one month after Smith filed her complaint with the EEOC. Finally, Smith contends that the employment experiences of Renee Hightower, a fellow African-American employee, support Smith's claims of discrimination. None of this evidence

demonstrates that Alcon's non-discriminatory rationale for discharging Smith is unworthy of credence.

With respect to Smith's argument that she has presented evidence which shows that she was in fact terminated on April 6, 2000, we do not find the proffered evidence to be relevant. Alcon's short-term disability policy is quite clear in its wording. It states that an employee's short-term disability coverage does not begin until "after seven consecutive days of a medically documented Disability." As part of this seven days, two weekend days are included. We have already noted that the first day Smith had to take off from work because of her Achilles tendon injury was October 5, 1999, the day of her surgery. Alcon's policy is explicit that an employee is only entitled to twenty-five weeks of short-term disability leave. Accordingly, the twenty-five week clock began ticking seven consecutive days after her surgery, or on October 12. Counting twenty-five weeks from October 12, 1999 results in the conclusion that Smith's disability leave expired on April 4, 2000. As Smith has conceded, she did not request that she be placed on long-term disability after her short-term leave ran out. Therefore, Alcon was justified under its policy to replace Smith in her assigned sales territory.

With regard to the actual date of Smith's discharge, Alcon has stated in its papers that she was released on May 31, 2000 because she failed to provide the requested medical documents. Smith has offered no evidence tending to prove that this explanation is factually baseless. In fact, whereas Alcon has provided written evidence to prove it genuinely believed Smith was discharged as of May 31, the plaintiff only points to the statements of two of her co-workers. In one of these statements, Smith has indicated that a nurse from Alcon contacted Smith on April 7, 2000 requesting medical information for Smith to return to work. Smith said, "I no longer work

13

for Alcon" to which the nurse responded "I know." (Pltf. 56.1 Stmt. at ¶ 165.) This statement is obviously hearsay. The other comment came from Rich Brotherson, an Alcon employee. In his deposition, Brotherson testified that he and Pygon retrieved company property from Smith's residence "after her termination." (Pltf. 56.1 Stmt. at ¶ 166.) As neither of these individuals are members of Alcon's management, we cannot conclude that their impressions or personal understanding of Smith's employment status at Alcon raises a genuine issue of material fact as to pretext.

As for Smith's contention that the May 11, 2000 letter requesting medical information was "suspicious" because it arrived one month after she filed her EEOC complaint, we conclude that this does not present evidence of pretext. In fact, the content of the letter demonstrates the good will that Alcon was willing to show Smith. By May 11, not only had Smith's short-term disability expired but she had also never submitted any documentation from her doctors indicating she was ready to return to work. At that point, Alcon was willing to give Smith one more chance to continue her employment with the company. The letter stated that her employment status was "unpaid medical leave of absence" and that Alcon needed "medical documentation either releasing you to return to work or making you eligible for long-term disability benefits. . . If we do not receive the medical documentation on or before Tuesday, May 23, 2000, your employment with Alcon will terminate effectively." It was Smith's own decision to ignore the requests made in the May 11 letter. Accordingly, we are unwilling to conclude that the May 11 letter, which actually gave Smith one more opportunity to remain an Alcon employee, constitutes evidence of discriminatory pretext for her discharge.

Finally, Smith offers the testimony of a former co-worker, Renee Hightower, as evidence of pretext. Hightower testified in a deposition that she was allegedly subjected to racial discrimination and a racially hostile work environment while employed as a sales representative at Alcon in 1992 and 1993. Hightower eventually resigned her position at Alcon in 1997 after she contacted the EEOC and the NAACP. Assuming that the testimony of Hightower is relevant (which we doubt considering that the majority of her allegations of discrimination occurred seven years before Smith's discharge), Smith has failed to demonstrate how this testimony shows that Alcon's non-discriminatory explanation for her discharge was merely pretext for racial discrimination. The testimony of Hightower is simply not probative as to whether Alcon genuinely believed its proffered non-discriminatory reason for Smith's discharge. Therefore, we find that Smith has not satisfied her burden under the *McDonnell Douglas* regime, and we grant summary judgment to Alcon on her race discrimination claim.

## B. Hostile Work Environment

In addition to protecting employees from racial discrimination, Title VII also prohibits employers from creating, condoning, or tolerating a hostile work environment. A "hostile" work environment is one that is "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" *Shanoff v. Illinois Dept. of Human Services*, 258 F.3d 696, 704 (7th Cir. 2001) (internal citations omitted). The issue of whether the work environment is hostile "turns on whether the alleged harassment occurred because of the [race] of the complainant." *Haugerud v. Amery School Dist.*, 259 F.3d 678, 692 (7th Cir. 2001). In other words, the question is whether the employee was "'exposed to disadvantageous terms or

conditions of employment to which members of the other [race were] not exposed.'" *Id.* (quoting

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998 (1998)).

Proof of hostile work environment is two pronged. In order to prevail, the plaintiff must present evidence sufficient to raise a reasonable inference that she *subjectively* experienced the environment to be abusive. She must also show, *objectively*, that a reasonable person in her position also would have perceived it to be hostile. *Haugerud*, 259 F.3d at 693; *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998). In order to determine whether the work environment is objectively hostile, we consider the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367 (1993).

In analyzing whether Smith was subjected to a racially hostile work environment, we ask whether all of the incidents she enumerates, considered cumulatively, would constitute sufficient evidence for a jury to infer race harassment. *Silk v. City of Chicago*, 194 F.3d 788, 807-808 (7th Cir. 1999); *Sweeney v. West*, 149 F.3d 550, 556-557 (7th Cir. 1998); *Galloway v. General Motors Service Parts Operations*, 78 F.3d 1164, 1166 (7th Cir. 1996). We find that they do not.

Smith enumerates the following five incidents in support of her hostile work environment claim:

- Pygon identified another African-American man in a training session and told Smith that he was the "whitest black guy" he had ever seen.

- A month later, Pygon told Smith about a teammate who did not trust African-Americans and that the teammate's attitude "makes sense . . . if that's the only experience you have had with black people."

- In January 1999, Danielle Koll, a co-worker, commented that she would "take the small waist" when she and Smith were discussing clothes alterations, and she also allegedly commented about the size of Smith's lips.

- In either January or February 1999, Julie Nelson, another co-worker, told Smith that she would not date a black man.

- In February 1999, Nelson voiced her opinion at a national sales meeting dinner that "affirmative action was, essentially, a free ride through the system."

In terms of the two pronged test to establish a racially hostile work environment, these statements clearly illustrate that Smith subjectively felt her work environment was hostile on account of her race.

The second prong of the test requires us to determine whether the work environment as described by the plaintiff is one that a reasonable person would find hostile or abusive. *See Harris*, 510 U.S. at 21. We will first address the comments made by Pygon, who, at all relevant times, was Smith's immediate supervisor. An initial analysis of Pygon's statements is important because if we determine that his actions created a racially hostile work environment for Smith, then Alcon is strictly liable for his actions through the principles of vicarious liability. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764-65, 118 S.Ct. 2257 (1998). However, we need not address this new standard for employer liability if the racially objectionable environment created

by the supervisor does not rise to a level actionable under Title VII. *See Fall v. Indiana Univ. Bd. of Trustees*, 12 F. Supp. 2d 870, 876 (N.D. Ind. 1998).

We start with Pygon's comment that an African-American man at a sales meeting was "the whitest black guy I've ever seen." Our analysis must begin with the understanding that the standard for judging hostility must be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788. The Supreme Court has noted that this standard, when properly applied, will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* Pygon's "whitest black guy" comment certainly falls within the category of comments identified by the Supreme Court as "gender-related jokes." This comment, while undoubtedly inappropriate, was made in the course of banter between two colleagues attending a sales meeting. Furthermore, even as Smith has conceded, this was the only questionable comment Pygon made during the entire meeting, and she never subsequently complained to anyone about it. Given the totality of the circumstances surrounding this comment, therefore, we conclude that Smith has failed to establish that this comment in any way altered the terms and conditions of her employment sufficient to trigger Title VII liability. *See Harris*, 510 U.S. at 23.

Smith also objects to Pygon's mention of his basketball teammate's prejudice toward African-Americans. With respect to this comment, it is important to note that Pygon was not expressing any personal prejudice he may have had against African-Americans, but rather he was describing the feelings and attitudes of another individual who had no connection with either Smith or Alcon. It is well settled in this circuit that when racial harassment is "directed at

someone other than the plaintiff, the impact of [such] 'second hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *Russell v. Board of Trustees of The Univ. of Illinois at Chicago*, 243 F.3d 336, 343 (7th Cir. 2001) (quoting *McPhaul v. Board of Comm'rs of Madison County*, 236 F.3d 558, 567 (7th Cir. 2000)). In this case, it is clear that Pygon's second hand recounting of his teammate's apparent racial prejudice was conducted in the context of a conversation he and Smith were having about racial stereotypes. This is evidenced by Smith's own statement in response to that made by Pygon. She told Pygon that her grandfather refused to allow white people to enter his home. Therefore, given the circumstances in which Pygon's statement was made, we conclude that his "second hand" statement did not have the effect of altering the terms and conditions of Smith's employment. Accordingly, we find that Pygon's actions and statements did not violate Title VII.

The remaining objectionable comments cited by Smith involve her co-workers at Alcon. First, Smith claims that Koll's stated preferences for clothes alteration are racially discriminatory. We do not agree. This Court is unwilling to hold that a work environment is racially hostile if a white employee states that she likes her clothing altered to accentuate her waist while, at the same time, a black employee prefers to alter her clothes to accent her backside. Any reasonable person would likewise conclude that such an isolated and obviously innocuous statement was not intended as racial harassment.

Next, we will address the comments made to Smith by her co-employee Julie Nelson. Of all the statements cited by Smith in her papers, these comments are the most "objectionable," yet we conclude that they do not even come close to demonstrating she was subjected to a racially hostile work environment. Nelson commented to Smith that she would never date an African-

American man and that affirmative action gave black people a "free ride through the system." As for the first comment, the law in this circuit states that "isolated and innocuous" comments will not support a hostile work environment claim even if those comments suggest some bias against ethnic minorities. *See Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 467-68 (7th Cir. 1998) (comments by co-workers that plaintiff should not be trusted because he was of "the yellow race" or because he was a Buddhist were insufficient to establish a hostile work environment); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th Cir. 1995) (nine mildly suggestive comments over seven months did not create a hostile work environment). Nelson's comment about interracial dating, though insensitive and inappropriate workplace banter, was an isolated comment that we do not feel rises to the level of racial harassment because she has not shown in what way it altered the terms and conditions of her employment.

With respect to Nelson's statement about affirmative action programs, based on what we can discern from the record, this comment was made during the course of a political discussion which took place at a social dinner during a national sales meeting. As the dialogue progressed, Nelson noted she was against affirmative action while Smith spoke in favor of it. However, Smith would now like to transform this simple political disagreement into an actionable case of hostile work environment under Title VII. We cannot sanction such a radical extension of employment discrimination law. If Smith's argument were correct, then any time a man and a woman engage in a political discussion at work, then the employing company could potentially be exposed to Title VII liability for sex discrimination if a disagreement arose between them. Furthermore, as to the specific nature of the challenged statement, we are unwilling to conclude that Nelson's comments about affirmative action constitute racial harassment when Justice

Clarence Thomas made a similar, if not more articulate, statement on the subject in the pages of the United States Reports. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 240-41, 115 S.Ct. 2097 (1995) (Thomas, J. concurring).

The discussion above clearly demonstrates that the individual comments made by Pygon and Smith's co-workers do not rise to the level of Title VII violations. However, our analysis is not complete until we consider the cumulative effect of these statements on the issue of whether a reasonable person would have also perceived Smith's work environment to be hostile. As noted earlier, in making this determination, the Supreme Court has instructed that we are to consider the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Viewed together, we note that these five discrete comments were made over the course of Smith's eighteen month employment at Alcon. Additionally, as a whole, we conclude that a reasonable person in Smith's position would not consider the five statements to be either severe or physically threatening or humiliating. Finally, considering the statements as a group, Smith has not persuaded us that they unreasonably interfered with her work performance. This is especially true in light of the fact that half of the statements were made during the course of work-related social gatherings.

Therefore, after considering the totality of the circumstances surrounding the five statements which allegedly created a racially hostile work environment, we conclude that the severity or frequency of these comments does not rise to the level necessary to sustain a hostile

21

environment claim under Title VII. Accordingly, summary judgment is granted to Alcon on this aspect of Smith's complaint.

## II.  Retaliation

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). In order to establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment decision; and (3) there is a causal link between the discharge and protected activity. *See Logan v. Kautex Textron North America*, 259 F.3d 635, 640 (7th Cir. 2001); *McKnight v. Chicago Housing Authority*, 2001 WL 987885, at *7 (N.D. Ill. Aug. 23, 2001). If Smith succeeds at establishing a *prima facie* case, Alcon must provide a non-discriminatory reason for its conduct, which, if unrebutted by Smith, would compel a grant of summary judgment in Alcon's favor. *See Rennie v. Dalton*, 3 F.3d 1100, 1108-09 (7th Cir. 1993). Smith cannot meet this burden because she cannot establish the third element of her *prima facie* case.

Assuming for the sake of argument that the complaints Smith registered with Pygon and Dooley regarding Nelson's comments constitute statutorily protected expression, there was too much time between her last complaint in August 1999 and her eventual discharge in May 2000 to establish causality. During this seven month period, Smith concedes that she was not subjected to further culturally insensitive comments from her co-workers and she did not make any additional complaints to Pygon or Dooley (likely because she was on short-term disability leave). As a general rule, if the time lapse between the protected expression and the adverse

22

employment action is significant, then courts are increasingly reluctant to conclude there is a causal link between the two. *See, e.g., Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S.Ct. 1508 (2000) (20 month period insufficient to establish causality); *Fyfe v. City of Fort Wayne*, 241 F.3d 597, 603 (7th Cir. 2001) (18 months insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) (4 months insufficient); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992) (6 months insufficient).

In this case, the seven months separating Smith's last complaint to Pygon and Dooley concerning her co-workers insensitive statements and her eventual discharge in May 2000 illustrates that the causal link between the two is simply too tenuous to support a retaliation claim. This is especially true in light of Smith's concession that she did not register any subsequent complaints with Alcon's management during her short-term disability leave. Accordingly, we conclude that Smith has failed to make a *prima facie* showing of a causal connection between her complaints to Pygon and Dooley and her discharge. Thus, Alcon is entitled to judgment as a matter of law on her retaliation count.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment brought by defendant Alcon Laboratories, Inc. pursuant to Federal Rule of Civil Procedure 56 is granted. Judgment is entered in favor of Alcon on all counts. This is a final and appealable order. This case is terminated.

Wayne R. Andersen
United States District Judge

Dated: July 23, 2002